# United States Court of Appeals
### For the Eighth Circuit

_____

No. 23-2403
_____

SWT Global Supply, Inc.

*Petitioner*

v.

U.S. Food & Drug Administration

*Respondent*

------------------------------

Medical, Public Health, Civil Rights, and Community Groups

*Amicus on Behalf of Respondent*

_____

Petition for Review of an Order of the
Food & Drug Administration

_____

Submitted: February 14, 2024
Filed: June 12, 2025

_____

Before LOKEN, COLLOTON,[1] and KELLY, Circuit Judges.

_____

KELLY, Circuit Judge.

---

[1]Judge Colloton became chief judge of the circuit on March 11, 2024.  See 28 U.S.C. § 45(a)(1).

SWT Global Supply, Inc. (SWT Global) is a Missouri-based manufacturer of electronic nicotine delivery system (ENDS) vaping products. The U.S. Food and Drug Administration (FDA) denied market authorization for SWT Global's menthol-flavored ENDS products, and SWT Global seeks our review under 21 U.S.C. § 387*l*(a)(1). In light of the Supreme Court's recent decision in Food & Drug Administration v. Wages & White Lion Investments, L.L.C. (Wages), 145 S. Ct. 898 (2025), we deny SWT Global's petition for review.

I.

Under the Family Smoking Prevention and Tobacco Control Act of 2009 (TCA), "new tobacco products"—tobacco products introduced to the market after February 15, 2007—must receive FDA authorization before being sold in the United States. See 21 U.S.C. § 387j(a)(1)–(2). As one avenue for approval, a manufacturer seeking to market a new tobacco product may file a premarket tobacco product application (PMTA) with the FDA, providing information about the product's ingredients, manufacturing process, labeling, and safety. See 21 U.S.C. §§ 387j(b)–(c).

The FDA is required to deny a PMTA if it concludes that "there is a lack of a showing that permitting such tobacco product to be marketed would be appropriate for the protection of the public health." 21 U.S.C. § 387j(c)(2). To determine whether a product is appropriate for the protection of the public health, the FDA must assess "the risks and benefits to the population as a whole," comparing both the "likelihood that existing users of tobacco products will *stop* using such products" and the "likelihood that those who do not use tobacco products will *start* using such products." 21 U.S.C. § 387j(c)(4) (emphases added). The FDA must "consider scientific evidence" in making this assessment, 21 U.S.C. § 387g(a)(3)(B)(i), and "whether permitting a tobacco product to be marketed would be appropriate for the protection of the public health shall, when appropriate, be determined on the basis of well-controlled investigations." 21 U.S.C. § 387j(c)(5)(A). The FDA has

discretion to determine what "valid scientific evidence" may be sufficient to evaluate whether a new tobacco product meets the standard. 21 U.S.C. § 387j(c)(5)(B).

In 2016, the FDA issued a rule deeming ENDS products, "including e-cigarettes, e-cigars, e-hookah, vape pens, personal vaporizers, and electronic pipes," to be new tobacco products. See Deeming Tobacco Products To Be Subject to the Federal Food, Drug, and Cosmetic Act, 81 Fed. Reg. 28973-01, 29028 (May 10, 2016). Because most ENDS products came on the market after February 15, 2007, the FDA's 2016 rule applied retroactively, forcing ENDS manufacturers (including SWT Global) to file PMTAs in order to continue marketing their products. See id. at 28990 (noting that "manufacturers of newly deemed products that are 'new tobacco products' . . . will be required to obtain premarket authorization of their products"). After a series of extensions, ENDS manufacturers were given until September 9, 2020, to file PMTAs. See Order at 1, Am. Acad. of Pediatrics v. FDA, No. 18–cv–883 (D. Md., Apr. 22, 2020), ECF No. 182.

In the months leading up to this deadline, as the FDA "fe[lt] its way toward" deciding "in clear and specific terms precisely what applicants would have to provide" to show their products were appropriate for the protection of the public health, the agency issued "voluminous and discursive documents" to ENDS manufacturers. Wages, 145 S. Ct. at 910. In a 2019 Guidance Document, the FDA stated that, due to ENDS products' novelty, ENDS manufacturers would not need to provide long-term studies or randomized control trials to prove a product appropriate for the public health's protection, so long as the applicant could provide other "valid scientific information" meeting the standard. The 2019 Guidance Document also recommended applicants conduct a "comparative health risk" analysis in which they "compare[d] the health risks of [the] product to both products within the same category and subcategory, as well as products in different categories as appropriate." And in April 2020, the FDA issued a Final Guidance Document noting that the FDA would "prioritize enforcement against . . . [a]ny flavored, cartridge-based ENDS product (other than a tobacco- or menthol-flavored ENDS product)," as well as "[a]ll other ENDS products for which the manufacturer has failed to take (or is failing to

take) adequate measures to prevent minors' access" and "[a]ny ENDS product that is targeted to minors or whose marketing is likely to promote use of ENDS by minors."

Additionally, in 2021 and 2022, internal memoranda reflected the FDA's "evolving assessment of the relevant issues." Wages, 145 S. Ct. at 916. For example, internal memoranda in 2021 showed the FDA wrestling with what scientific evidence it would consider outside of randomized control trials or longitudinal studies. See id. at 922–23. And a series of internal memoranda circulated in October 2022 showed officials at the FDA's Center for Tobacco Products' Office of Science (OS) debating, and ultimately changing their views on, an "approach for evaluating menthol-flavored ENDS." While OS had originally recommended internally that menthol-flavored ENDS products be authorized for sale, it later "reassessed." OS determined that youth used menthol-flavored ENDS products with similar, high frequency to other non-tobacco flavors,[2] and that "the literature did not demonstrate that menthol-flavored ENDS were differentially effective, relative to tobacco-flavored ENDS, in terms of promoting significant cigarette reduction or complete switching among adult smokers." Accordingly, the FDA concluded that "it was reasonable and consistent to treat menthol-flavored ENDS PMTAs in the same way as other non-tobacco-flavored ENDS PMTAs regarding the evidence needed to show a potential benefit to adult smokers."

---

[2]The memorandum cited a 2022 National Youth Tobacco Survey of high school and middle school students who used ENDS products, which showed that for youth, usage was highly concentrated among non-tobacco flavors: of the students who smoked, 85.5% of high school and 81.5% of middle school students claimed to use non-tobacco flavors; 26.6% of students claimed to have used menthol-flavored ENDS products; 29.4% had used mint, 38.3% had used "other sweets," and 69.1% had used fruit.

Against this backdrop, SWT Global filed its PMTAs for various menthol-flavored "open-tank" ENDS products on September 9, 2020.[3] SWT Global's PMTAs included a review of the scientific literature studying ENDS products, as well as national and customer actual-use and perceptions surveys.[4] SWT Global also included a copy of a marketing and access-restriction plan provided by the Smoke-Free Alternatives Trade Association (SFATA), of which SWT Global was a member. As a participant in SFATA's plan, SWT Global agreed to adopt numerous measures to prevent the sale of its ENDS products to youth, including the "TraceVerify" program, whereby its products would be manufactured with an "RFID tag" that would be traceable and could be scanned "[a]t the point of sale . . . along with the ID of the purchaser." The SFATA plan and scientific literature review were not specific to SWT Global's own products,[5] and the PMTAs did not include individualized scientific studies or longitudinal data of behaviors for adult smoking cessation or product switching over time.

In an order dated May 12, 2023, the FDA denied SWT Global's PMTAs. The order concluded that the PMTAs "lack[ed] sufficient evidence demonstrating that [SWT Global's] flavored ENDS will provide a benefit to adult users that would be adequate to outweigh the risks to youth." The FDA determined that, due to the popularity of ENDS products with youth, SWT Global would have had to show with "sufficiently robust and reliable evidence" that "any risks posed by a new product to

---

[3]There are both "closed" and "open" ENDS products; "closed" or cartridge ENDS products "contain a set amount of e-liquid that is determined by the manufacturer," while "open-tank" or "open-system e-cigarette[s] contain[] a 'tank' that users can manually refill with the desired amount of e-liquid." Wages, 145 S. Ct. at 909.

[4]The literature review, which did not address the specific products for which SWT Global sought PMTAs, concluded that "ENDS use is less harmful than smoking combustible cigarettes, and results in less dependency by the individual."

[5]The literature review did include an SWT Global customer survey addressing customers' general use of and preferences for ENDS products, but the survey did not address the specific ENDS products at issue in SWT Global's PMTAs.

youth . . . [were] outweighed by a sufficient benefit to adult users" via smoking cessation or switching from combustible cigarettes to vaping products. SWT Global failed to do so because the PMTAs lacked product-specific evidence allowing the FDA to compare its flavored ENDS products, including the menthol-flavored products at issue,[6] to tobacco-flavored ENDS products "in terms of their impact on tobacco use behavior among adult smokers." In other words, the PMTAs would have needed to provide "[r]eliable and robust data" that menthol-flavored ENDS products would attract adults away from combustible cigarettes over time and thus diminish the overall harm caused by the products' risk to youth. The order added that SWT Global "could have" accomplished this "using a randomized controlled trial and/or longitudinal cohort study," but that the FDA "would also [have] consider[ed] other evidence" toward the same end.

The order also found SWT Global's proposed marketing plan insufficient. SWT Global's marketing plan relied on sales restrictions—age-verification procedures at sale (including the "TraceVerify" program), age-restricted retail locations, monitoring of retailers, and contractual penalties for retailers who failed to comply with these measures—which the "FDA has found . . . do not in themselves provide enough assurance of a sufficient reduction in youth use to mitigate the substantial risk flavored ENDS pose to youth." In its review of SWT Global's PMTAs, the FDA noted that sales restrictions do not solve the access problem because studies showed "the majority of youth do not purchase e-cigarettes themselves from retail locations, but rather they obtain them from social sources, including from friends or family members, steal them, or use someone else's product."[7] Accordingly, SWT Global's plan "did not propose any novel or materially

---

[6]In 2021, the FDA denied SWT Global's separate PMTAs seeking authorization to sell non-tobacco ENDS flavors other than menthol; SWT Global challenged those denials in the Fifth Circuit. See SWT Global Supply, Inc. v. Food & Drug Admin., No. 21-60762 (5th Cir. Oct. 1, 2021).

[7]The FDA added that "novel device access technologies," such as "age-gating technologies that require user identification by fingerprint or other biometric parameters in order to unlock and use a tobacco product or geo-fencing

different measures from those that FDA has previously considered and found insufficient."

SWT Global was not alone in losing its bid to market ENDS products. In 2021, the FDA denied PMTAs to an estimated "320 applicants . . . s[eeking] approval for approximately 1.2 million [flavored ENDS] products." Wages, 145 S. Ct. at 914. In 2022, the agency determined that menthol-flavored ENDS products would be treated similarly to other non-tobacco-flavored ENDS products and denied an additional slate of PMTAs like those at issue in this case. See, e.g., Logic Tech. Dev. LLC v. U.S. Food & Drug Admin., 84 F.4th 537, 546–48 (3d Cir. 2023), cert. denied, No. 23-1125, 2025 WL 1151228 (U.S. Apr. 21, 2025). This case is thus one of many challenges to the FDA's PMTA denials for flavored ENDS products.

II.

Under the APA, we must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The "standard ensures that an administrative agency 'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" Wages, 145 S. Ct. at 917 (quoting Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)). Agencies may change positions or policies without violating this standard, "'as long as they provide a reasoned explanation for the change,' 'display awareness that [they] are] changing position,' and consider 'serious reliance interests.'" Id. (quoting Encino Motorcars, LLC v. Navarro, 579 U.S. 211, 221–22 (2016)).

On appeal, SWT Global claims that the FDA's denial order was arbitrary and capricious for two reasons: 1) the FDA changed position without notice as to the

technologies," could potentially mitigate the risk to youth, but these measures were understudied. They were also not proposed in SWT Global's PMTAs.

-7-

scientific standard by which it would judge PMTAs, "reversing its position on requiring long-term studies for PMTAs and imposing a new comparative efficacy requirement"; and 2) the FDA failed to properly justify its finding that SWT Global's marketing plan was insufficient, in particular because it ignored differences between closed and open ENDS products' attractiveness to youth.

While this appeal was pending, the Supreme Court resolved another case in which ENDS manufacturers challenged the FDA's denial orders. See Wages, 145 S. Ct. 898. Wages held that the FDA's denials of PMTAs for ENDS products with flavors other than tobacco or menthol "were sufficiently consistent with [the FDA's] predecisional guidance and thus did not run afoul of the change-in-position doctrine."[8] Id. at 919. In reaching this conclusion, the Supreme Court held that the FDA had not changed position with regard to: what scientific evidence would be required; how to demonstrate comparative efficacy; and how the FDA would treat different (open versus closed) device types. Id. at 919–29.

Wages largely resolves the issues raised in this appeal. SWT Global's grounds for reversal primarily hinge on whether the FDA changed positions by adopting the standards it ultimately used in its PMTA denials, but Wages rejected those arguments. SWT Global claims the FDA switched position without notice by "retroactively demand[ing] long-term evidence" after suggesting in its 2019 Guidance Document that long-term studies were "not expected to be included in the application." But the Supreme Court determined that "[b]oth the TCA itself and the FDA's guidance left the agency broad discretion to decide what sort of scientific evidence an applicant was required to submit," and thus "[n]o change in position

---

[8]In Wages, the Court determined that the proper avenue for challenging agency action that potentially involved "mislead[ing] regulated entities" was the change-in-position doctrine. 145 S. Ct. at 917. The Court declined to review the FDA's decision under a "freestanding 'fair notice' argument," whose "exact contours . . . are somewhat unclear," and expressed skepticism that such a doctrine would look any different than the change-in-position doctrine. Id. at 917–18. Accordingly, where SWT Global couches its arguments in the language of "fair notice," we analyze them under the change-in-position framework.

occurred in this respect." <u>Wages</u>, 145 S. Ct. at 919–21. SWT Global also argues that the FDA made a "retroactive invention" by "requiring applicants to show a comparison to 'tobacco-flavored products,'" despite the FDA having earlier indicated that manufacturers had discretion to pick comparators. But by denying PMTAs that failed to compare non-tobacco-flavored ENDS products to tobacco-flavored ENDS products, "the FDA did not contradict any previously announced position." <u>Wages</u>, 145 S. Ct. at 923–24 ("The record does not suggest that the FDA contradicted its predecisional guidance by requiring certain cross-flavor comparisons.").

<u>Wages</u> is decisive on this point despite the fact that it did not concern menthol-flavored ENDS products. Just as with other ENDS products, the agency did not articulate firm requirements regarding how it would treat menthol-flavored ENDS products before issuing its PMTA denials, so it never changed position. <u>See</u> <u>id.</u> at 919 ("[W]e conclude that the FDA's denial orders were sufficiently consistent with its predecisional guidance and thus did not run afoul of the change-in-position doctrine."); <u>see also</u> <u>Logic</u>, 84 F.4th at 553 (rejecting similar challenge to FDA's denials of PMTAs for menthol-flavored ENDS products). For example, while the FDA's 2020 Final Guidance Document claimed that it would "prioritize enforcement against . . . [a]ny flavored, cartridge-based ENDS product (other than a tobacco- or menthol-flavored ENDS product)," it never suggested it would automatically grant PMTAs for menthol-flavored ENDS products. <u>See</u> <u>Wages</u>, 145 S. Ct. at 926 ("[N]othing in the 2020 guidance suggested the FDA would decline to take enforcement action against other products that might be appealing to the young."). Indeed, as the Supreme Court pointed out, the agency "followed through on the 2020 guidance's warning that the agency would *also* prioritize enforcement against manufacturers whose [products'] marketing is likely to promote use by . . . minors." <u>Id.</u> (quotation omitted).

Next, SWT Global argues that the FDA arbitrarily discounted SWT Global's marketing proposals, specifically in light of the "vastly reduced appeal" its open-

tank ENDS products had to youth as compared to closed-system ENDS products.[9] But in the FDA's denial order, the agency explained that despite "variability in the popularity of device types among youth," it was "[s]till" the case that "across these different device types, the role of flavor [in attracting youth] is consistent." See Wages, 145 S. Ct. at 927 (making this point). And the FDA concluded that menthol-flavored ENDS products' popularity among youth made "it . . . reasonable and consistent to treat menthol-flavored ENDS PMTAs in the same way as other non-tobacco-flavored ENDS PMTAs." The FDA's decision to treat open and closed menthol-flavored ENDS products similarly, and to reject SWT Global's PMTAs partially on that basis, was thus not arbitrary and capricious. See Wages, 145 S. Ct. at 927 (holding that the FDA's decision to treat open and closed ENDS products similarly was not arbitrary and capricious even if it represented a change of course, since any change was "conscious" and the FDA gave "good reasons" (quoting F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502, 515 (2009))).

Finally, SWT Global suggests that the FDA more broadly failed to justify its finding that the marketing plan in its PMTAs was insufficient. But the FDA explained that point-of-sale restrictions and marketing changes did not sufficiently protect youth, as youth frequently accessed ENDS products after the point of sale. Contrary to SWT Global's contention on appeal, the FDA acknowledged the TraceVerify program's insufficiency in this regard, and explained that instead, restrictions beyond the point of sale—for example, biometric use barriers—could combat the problem. The agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action." See State Farm Mut. Auto. Ins. Co., 463 U.S. at 43.

---

[9]Wages does not squarely resolve this issue. In Wages, the FDA had not evaluated the ENDS manufacturers' marketing plans at all after having described the plans as "critical" in predecisional guidance. 145 S. Ct. at 929. The FDA did not contest that this was error, so the Supreme Court remanded to apply a version of harmless error review. Id. at 929–31. Here, by contrast, the FDA did consider SWT Global's marketing plan and provided justification for finding it insufficient. Accordingly, we assess whether the FDA gave a "satisfactory explanation" for its decision. State Farm Mut. Auto. Ins. Co., 463 U.S. at 43.

We deny SWT Global's petition for review.

_____